I take counsel out here on that case. I'll be more counsel in the environmental case. Okay. Let's get settled and get started as soon as you are ready. May it please the court. Aaron Avila for the United States. With me at counsel table is Scott Horngren, counsel for defendants, intervenors. I'll be using 12 minutes of our time. Just keep your eye on the clock. We have whatever you have left. Okay, great. I'll first talk about our appeal on the water quality issue and then I'll turn to plaintiff's cross appeal on the consideration of unroaded areas. On the water quality issue, the district court erred when it concluded that the law was not followed and then imposed the extraordinary remedy of enjoining project activities until the state of Montana establishes total maximum daily load figures under the Clean Water Act. The court erred for at least three different reasons. First, the Clean Water Act doesn't require that TMDLs be in place before this project proceeds. Let me just interrupt right there. They are not saying that the Clean Water Act requires... Okay, TMDLs. I agree and plaintiffs have conceded that in their brief. Okay, but you just gave that as a ground... Truth be told, I'm not sure what law the district court thought was not followed here. The only statute cited by the district court in its analysis on this is a Montana state statute that is meant to apply pending completion of a TMDL. And then the district court's interpretation and order and injunction renders that statute internally inconsistent by saying, absent a TMDL, you can't know if you're complying with the statute is what the district court seemed to be saying. So that's why I mentioned the Clean Water Act and you're absolutely right, Your Honor, that plaintiffs don't claim that the Clean Water Act requires that TMDLs be in place. Plaintiffs have sought to kind of turn the district court's decision into a NEPA one, saying that, I guess, that the Forest Service didn't adequately look at water quality impacts here. But the record in this case is extensive. It shows what the levels of sediment would be with and without this project, alternatives to the project. I guess what I was trying to, maybe Sarah Clip can explain it better, but I thought the bottom line was sort of this chicken and egg problem, which was how could you take a hard look if you didn't know how much sediment that the streams actually would be capable of absorbing, not that they might get some sediment, but you wouldn't know how much they would be capable of absorbing. And so I'm interested to hear what the Forest Service has to say to what, as I say, I think it's kind of a chicken and an egg thing on who comes first, the TMDLs, or do you deposit some sediment and keep going and then figure it out later? Well, first, a TMDL is a tool for states to meet their water quality standards in their continuing planning process under the Clean Water Act. So it's not at all clear that a TMDL is going to provide this kind of, what the stream is capable of carrying away, first of all. Second of all, under NEPA, the Forest Service only needs to, an EIS is supposed to disclose the comparative environmental effects. The Forest Service looked at existing conditions, conditions absent in the action, in connection with the post-burn plant, and looked at, in detail, three alternatives. Showed what the difference in sediment reduction will be across those alternatives. Less sediment over the long term will be delivered to these water bodies. Improving water quality. It disclosed that sediment does impact fish habitat. So I think that's the answer, is that the Forest Service gave a hard look at this issue, and NEPA requires only that you do a comparative analysis. Well, what I don't understand, and help me with this, how in the world can you decide how much sediment the streams will carry within a TMDL? I don't think a TMDL will tell you how much sediment a stream is going to carry away. What does a TMDL tell you, then? Depending on, it tells you the total sources, non-point sources, point sources, and natural background, the sum of those, that the state determines would be likely to make a water segment meet its water quality standard. Which includes the amount of sediment. Not necessarily. Well, as the state of Montana, as Amicus points out, this isn't going to be X tons of sediment. It's often expressed in terms of targets, a percent reduction from non-point sources. But putting that aside, NEPA does not require, NEPA only requires that the Forest Service take a comparative look at the environmental consequences of its actions. There's no basis for requiring the Forest Service to wait until the state of Montana creates some information to complete its NEPA analysis. This court has said, in the Inland Empire case, that an EIS that uses currently available information is an adequate one. That's what the Forest Service did here. There's just no basis for holding up this project until a third party creates information under a completely different statutory scheme. As I mentioned also, the water quality standards are being met here. The state of Montana looked at the project, expressed its support, which it confirmed in a letter. The statute that the district court relied on, as I stated earlier, renders the Montana statute inconsistent. If there's no other questions, I'd like to turn to the consideration of UNROADED very quickly. On the UNROADED issue, the cross-appeal. Sorry. On that issue, the district court properly concluded that the Forest Service adequately analyzed the project's effects on UNROADED areas. The Forest Service looked at the UNROADED characteristics of this project area. The Forest Service identified UNROADED areas and noted what activities will be taking place within them. May I ask you a question about that? There's one sentence in there, and at the EIS, that really troubles me, and that is, harvest activities could have a direct effect on the potential for these areas to be recognized for their undeveloped nature and added to existing inventory roadless areas or wilderness. That's on FEI 76. In other words, they, in the report, in the FEIS, are saying, this may have an effect on the wilderness areas. What is your response to that? My response is that's exactly what NEPA asked the Forest Service to do, is to disclose the potential impacts of its project. I mean, that's really, it seems kind of circular. Is that all they have to say, is there will be an effect, period, and then they discharge their obligation? Under NEPA, yes. If they said, it will destroy the wilderness, they commented, and that's all they have to do. There's other requirements. All of these activities are taking place in, all project activities are consistent with the management areas that are designated in the forest plan. That's not to say, so it's being, things that were being managed for purposes of wilderness under the forest plan are continuing to be managed that way. The Forest Service looked at the unroaded character of this area, identified unroaded parcels that aren't currently designated wilderness, aren't, are just unroaded, and said, we will have, these harvest activities will have an impact. But it also is going to decommission roads, creating, I think it's, I don't remember the exact figure, but 1,800 acres of unroaded area. Well, the difficulty I was having is, it's one thing to say, well, there'll be no effect, but the ultimate determination is, you know, will there be an irreversible and irretrievable commitment of resources? I think that's now been kind of the code word. And what the Record of Decision said in that regard said, well, no, because there's no permanent road construction. And it seemed to me that that, in some ways, begs the question, because the fact that there's no permanent road construction is positive, I suppose, in the sense of potential downstream wilderness designation. But it doesn't tell you what the effect of the logging is going to be on all of the, you know, potential downstream wilderness designation, or any other use. So I was concerned, and maybe you can give me your view from the Forest Service, that that's kind of a non-sequitur. In other words, it doesn't answer the question to link irreversible commitment solely with the existence or non-existence of a road. First of all, I would say, and I hope this answers your question, NEPA, the irreversible and irretrievable commitment of resources comes from, when that occurs, you need to prepare an EIS. It doesn't say there can't be an irreversible and irretrievable. So what happened was, I mean, probably, I mean, so the Forest Service did what it was supposed to do. NEPA doesn't say, NEPA is not a substantive statute. It's a procedural one, and all that says is that if there's an irreversible and irretrievable commitment of resources, you need to do an EIS. And that is what the Forest Service did with respect to these areas. I would like to give Mr. Horngren. I'm sorry. I'm trying to figure this out, and it's not clear from your brief, so that doesn't answer my question. I'm sorry. Okay. So the fact, then, is you still have to analyze the effects, and if you split out unroaded areas from the inventory to unroaded areas, it seems that at most all it says is, well, it could have an effect, but it doesn't tell you what that would be. Well, the Forest Service did discuss the effect of, the appearance of the timber activities in the FEIS, how it will impact visually from inventory roadless areas, the view of where these harvest activities, how road decommissioning will in the short term have an impact on visual, natural, the solitude of the area. I mean, it did discuss those factors also. It didn't just say there will be an effect. It described those effects. Did that? Is that your answer? I think I'll keep a couple minutes for rebuttal. Following up on his answer to your question, the EIS addresses the roadless areas in at least four different ways, and you don't see this in all EISs when you're dealing with roadless areas. Number one, or they call them unroaded areas, and there's two types of areas here. First, the inventoried areas. And I'm not interested in those because they have extensive discussion. Okay, that's right. And the unroaded areas, which the Forest Service itself defined. They weren't required to, but they defined them themselves, including areas between two roads that had past harvest in it. And so number one thing the EIS did is it drew a map of these areas, which Intervenor Mineral County really disputes whether they even had to do that. Number two, what they did is they showed where the harvest units that were going to occur were created relative to the unroaded areas and the inventoried roadless areas. And there's maps in the EIS, and it said, here's our unroaded area, here's where the units are going to be. They also showed where these unroaded areas are in relationship to past harvest. They had maps there that showed the past activities, whether they were thinning activities or other types of harvest. And fourth, they described how these activities would affect those unroaded areas, as co-counsel stated, affecting the apparent naturalness and that sort of thing. And then lastly, and I think this point is made strongly by both of us in the brief, is the other thing that's going on in this EIS is that the Forest Service is creating a number of roadless areas by putting roads to bed and closing roads permanently so that these areas now are considered roadless, are eligible for wilderness in the future. And what we have here is an irony where we're closing roads, what was normally in the past, maybe 10 years ago, considered an irreversible, irretrievable commitment of resources, and now they have the technology to put these roads to bed to create large areas where no one can drive and basically recreate the roadless areas. Well, let me just ask my question again. The FDIS says potential damage to wilderness. Then the ROD comes along and says the final determination of the value of these areas as potential wilderness will be reserved for the forest planning vision process. What I don't understand is how you can have the cutting and then later determine the value of this as wilderness. Because the regulations do not require the Forest Service to make a designation for roadless or wilderness at the project level, and the planning regulations say that the Forest Service needs to identify these areas, tell the people that they're there, disclose what the effect is going to be, and the effect on some of these areas is going to be to cut trees, although in our supplemental excerpt for record we have some pictures where there was harvest that did occur before the injunction was entered, and in some of the areas that are cut and uncut you can't tell because of the partial cutting. I guess that explains why the injunction. In terms of the injunction, we don't believe the injunction was based on roadless area issues. It was based on the TMDL issue. I'd like to turn to that. Can I just ask one last question? Yes. It seems like there's three alternatives. One, we know that they don't have to make a wilderness characterization or determination at this site-specific project level. Correct. That's the forest plan responsibility. However, if you irretrievably change the landscape, it doesn't matter when you make the wilderness characterization because it might never be there to be made. Right. What the EIS says is, well, we only looked at the physical effects, and then it says the effects on the characteristics of these areas for determining value as additions to inventory roadless or wilderness was not completed. I guess the question I have is whether the Forest Service is required to do something more than just say, well, there will be effects. In other words, in order for the decision maker to decide among the various alternatives, to say there will be effects seems almost like saying nothing because, of course, there will be effects, but to not really detail what those are without making a judgment on wilderness seems to me to be no information at all. That's all that NEPA requires. Now, the National Forest Management Act, which governs the planning, the thing to keep in mind here is the planning for this forest occurred several years before, and there were fights over roadless areas and what areas are going to be available for timber harvest and what aren't. In this particular area, the EIS tears to that plan and says, this is designated for timber harvest. This is designated for wildlife management, and it is not up to the project to revisit those detailed land allocation decisions that were made in the original plan. You mentioned the chicken and the egg, and then I'm going to sit down. Here, the chicken does not have to lay the egg for the farmer to understand how to take care of the chicken, and I think what we have here is the Forest Service in a situation where they realize that there are sediment problems from the fire, and they disclose that. We do not believe, Mineral County is concerned, because all the sediment comes down to where the county residents live in the bottom, and they want something done about that. They can't do it. They don't own the land. They can't do it. They don't prepare the TMDL, but I think that it's in some ways a red herring on this absolute figure of sediment. If you look at the Pronsolino case, there they had a TMDL. They had 552 tons of sediment, but the landowners were required to do things under the TMDL to address the sediment issue, and if you look at footnote 6 in that case, it talks about that specifically the harvesting permit specified that the Pronsolinos would identify the sources of sediment, implement practices to reduce sediment, not operate on steep slopes. There's a laundry list of things there, and if you run by those and compare those to what the Forest Service did in the EIS, they have adequately addressed the sediment issue without needing to know the specific absolute value. They look at the relative value two ways. One, the percentage above natural, and also the relative differences between the alternatives, and we believe that's adequate, and I'd like to save the balance. Okay, we'll hear from the board of council. Good morning. My name is Eric Huber. I'm a staff attorney with the Sierra Club representing the Sierra Club and Alliance for Wild Rockies. I want to use about 50% of my time on the water issues and 50% of it on the unroaded issues, beginning with the water issues. Now, the Forest Service seems somewhat confused in terms of what law was violated here, and we started off hearing from them on that, and it was in our complaint, and it is in the judge's order, that the applicable law here is, of course, NEPA, which requires an analysis of environmental impact and environmental effects. Now, what the judge held was they couldn't do an adequate analysis of environmental impacts without knowing the baseline of what they were doing. The district court held without a baseline, there is no way. And where does that come from? Pardon me? And where does that come from? Where does the district court's holding come from? I mean, why can't they not, in fact, do an analysis without knowing the baseline? Well, as a matter of... I mean, what is the source of law for that? I think that's what the government said they were confused about, and what I'm confused about. NEPA says, you have a look. It doesn't set any substantive standards, and the district court here imported a substantive standard, and I, from where? Well, as a matter of logic, to begin with. You know, logic is good, but law is better. Since you were talking about law, and you were saying, oh, the government doesn't know what it's talking about because it's confused, it's violating the judge's order, let's talk law. Sure. Without a baseline, there's no way but speculation to know what you are causing in terms of the harm, and that's not the first time that's been held and found by this court. I'm sorry, why is that? Because, well, let me put it this way. If you have a cup of water, a measuring cup, and you're going to dump something into the measuring cup, to know whether you're going to cause it to overflow or not, you must know how much it can hold. Congress recognized that. Well, yes, if it's a measuring cup. Yes, or a river or a receiving stream. That is the purpose, and Congress recognized that in Section 303D. But you can know what you're going to dump in without knowing what the ultimate effect is. Not if you want to know the ultimate effect. If you want to know the ultimate effect, but what is it that says you've got to know what the ultimate effect is? NEPA, you must analyze environmental impacts and environmental harm. Okay, but the difference is that it seems to me that a baseline would be helpful, but I don't see how it's mandated when even these TMDLs are nothing more than kind of back-of-the-hand efforts to provide some analysis. And you've got the state weighing in, and, in fact, you probably have a better situation. Everybody's agreeing here by what is being recommended. So why can't you have a narrative analysis based on their best judgment, based on best management practices? The standard that must be met is one of use. Those are the water quality standards. They set uses, in this case fishing and swimming. And then they set up criteria to meet those designated uses. So when we're trying to decide, are these uses going to be met in this water? Is it going to be fishable? What do you say they, you're talking about? The forest service. They made a determination that water quality standards would be met here. The water quality standard is, first off, a use standard under Section B-1 of the state regulations, which says that it must be fishable. And they know, since it's on the 303D list, that it's not fishable. It's not meeting its designated uses. Now the question is, what actions can they take or must they take to achieve those uses? And the state statute and the state regulation refer to reasonable practices. Why don't you try to turn NEPA into a substantive statute when it really is just a procedural statute? All it says is you take a look. Yes. And it doesn't require any goals. Yes, you could say, you know, this is going to be terrible for the environment. You know, here are the devastating things that'll do. It might violate the Clean Water Act or something else, but it wouldn't have violated NEPA. So why don't they say it later? Well, no, I'm not trying to turn NEPA into a substantive statute. I'm saying they did not take the hard look here because they don't know whether water quality standards would be being met, what measures they must take in order for those to be met. And you're saying the only way they could do that would be through the completion of the TMDL? Well, without knowing the loading capacity component of the TMDL, they wouldn't know what they must do to meet the uses. In that regard, the state statute and the state regulation refer to reasonable practices being used. They do not refer to best management practices being used. All the Forest Service did here was come in and go, as long as we're using these best management practices, it's going to be all right. It doesn't matter that the standard is not going to be met, that the uses aren't going to be met, the stream's not feasible. So is your quibble between best and reasonable? Among other quibbles. But the point is this, and the best way I could put this is to refer to the Blue Mountains case because that is the case where this court saw this before and addressed this issue. And in that case, the Forest Service was found not to have taken a hard look under NEPA because they did not know the impacts of the sediment on the water. And in fact, in that case, the Forest Service did more than they did in this case. Reading from page 1213 of that... Which case was it again? This is the Blue Mountains case at 161F3rd at 1213. All right. There it had... Are you reading from where? Page 1213. Just give me a second to get that. First column or second column? Second column in what I have. All right. Under heading six. Last sentence. And my point here is... Yes, my point here is simply, it says at the last sentence of paragraph number six there, the Forest Service's only attempt to measure sedimentation failed when its data collection box overloaded with sediment. Now, they didn't even put the box in the water in our case. They have, and it's an undisputed fact, they don't know how much sediment's in that water, how much it'll hold, how much they need to reduce elsewhere to get the sediment levels down to the fishable level, the water quality standard level. They simply do not know that, so they didn't put the bucket in the water in our case. Now, they did do this water quality program called LoloSed, which tells them if they cut on a certain slope of certain acres and this kind of thing, we can expect so much sediment to run off into the water. But again, without knowing how much is in the water, they can't measure the impact. They have nothing to compare it to. Well, now, if NEPA is a procedural statute, why isn't LoloSed sufficient for NEPA purposes? Because they don't have the information on the impact. Just knowing that we're going to dump 50 tons of sediment into our cup tells us nothing if we don't know how much the cup can hold. It's not going to tell us whether it's going to be fishable or swimmable after we do that. And that's why this court went on to hold in Blue Mountains that we have warned that general statements about possible effects and some risk do not constitute a hard luck. And that's what happened here. Now, I want to turn to the unroded issues for the remainder of my time. There were two mistakes made here. The district court actually entered summary judgment against us on the unroded issues, saying that they took the hard look in that case. But there were two mistakes the Forest Service made. First, they said that there was no irreversible and irretrievable commitment of the resource. And second, they put off analysis of the wilderness values of these unroded areas to the next planning process, after they were logged, of course. So, beginning with the first one, NEPA requires identification of irreversible and irretrievable commitment of the resource. It's actually in the statute, section 4332. The deciding officer approved the project, saying, because no permanent road construction will occur in these areas, there is no irreversible and irretrievable commitment of the resource. Now, the Smith case, Smith v. United Forest Service from 1994, is directly on point, because the Forest Service was doing the same thing with unroded areas in that case that they're doing here. And the court said, the decision to harvest timber on a previously undeveloped tract of land is an irreversible and irretrievable decision. Let me ask you about Smith. I don't think they had anything in there about the effects. And the Forest Service here says, well, I'm sure they would say this isn't Smith, because we have something in there. And their argument that you just heard is that they have some statements that there wouldn't be any effects, or that there could be some effects, but then they don't describe them. So, where do we look in our case law to see whether that is? Well, Smith actually has two parts, both of which are present in this case. And they're kind of trying to blend them together, say, well, okay, we said it wasn't irreversible and irretrievable, but we did look at it over here under another section. They can't disown the statements they made. They said it in the record of decision, and said it in the EIS, that it was not irreversible and irretrievable. And so, on that point, we have clear-cutting in this case of live trees in an unroaded area, and that simply is an irreversible effect. Their answer is, well, it may still be a wilderness area in the future. We could still go back and look at it at some point in the future and say this is a wilderness area. And that's exactly what Smith said is irreversible, because under the Wilderness Act, the first standard is whether the imprint of man is substantially noticeable. And frankly, if you have a field of stumps, the imprint of man is substantially noticeable. Whether you came in and took them out with helicopters or however you did it, the imprint of man is noticeable. So that is why it's an irretrievable act. Now, as far as the delay of the analysis of the wilderness, and your Honor to answer your question, they did not consider it. And as you pointed out when they were up here addressing the Court, if you look at the sections they cite of the Environmental Impact Statement, section 4.5, and there's 12 pages there, and the heading of it is Unroaded and Inventoried Roadless Areas, and you look and read through there, their analysis of these factors of natural integrity and remoteness and solitude, they march through the six Inventoried Roadless Areas by name for 12 pages. And there's nothing in there on these unroaded areas. So they didn't look at these. They did not evaluate their wilderness characteristics or their wilderness values there. What, in your view, is the relationship then between the Forest Plan, which tries to avoid having these kind of piecemeal redeterminations, and the position that you take? Well, for starters, we don't have the record for the Forest Plan here. So this concept that they considered all of this in the Forest Plan, we dispute. All the Forest Plan did was to go in and say, all right, this is going to be the Inventoried Roadless Area. And some analysis of wilderness characteristics was made for that. At the time of the Forest Plan, these unroaded areas weren't even identified. And again, that record is not here. The record we have here is simply that they have Inventoried Roadless Areas and they have unroaded areas, and they didn't analyze the wilderness factors for the unroaded areas. They refer to a regulation that says this is an okay approach, that they just have to consider this once in the planning and then never again. And again, that is exactly what Smith held was wrong. In Smith, they had an Environmental Impact Statement that was done at the planning level regarding the Inventoried Roadless Areas. And Smith then related to a project level? It was at a project level, yes it was. And they had not analyzed it there either. And it makes sense if you think about it because things can change over time. And had they gone through for the unroaded areas at the planning level and set and ticked off the wilderness characteristics, maybe they would have some argument. Now they don't have to do it again because you're not just going to have to do it repeatedly. But they didn't do it. In fact, no part of this record contains any assessment of the roadless or wilderness values of the unroaded areas in this project. They said they were going to put it off until the next planning level analysis and that's in fact what they're going to do. But by then it will be logged. So to sum up, on the water issues, they violated the NEPA hard look requirement because they know the logging will increase the sediment. They know it's not meeting users as a fishing, swimming stream and they have no idea how much of a reduction is necessary to make it fishable or swimmable. And to sum up on the unroaded issues, Smith held that logging in an unroaded area is an irretrievable commitment of the resource. And Smith also held that they must consider wilderness characteristics of unroaded areas at the site-specific level. And neither of those things were done here. Thank you. Thank you, Your Honor. One thing very quickly about the forest plan. In our further excerpts of record on page 12, MA-12, the management area 12, consists of portions of the forest that have been classified as wilderness or are proposed for wilderness classifications. The goals of this MA are to manage, among other things, manage existing wilderness in accordance with the Wilderness Act of 1964. Could you just say that where in the further excerpts? It's page 12 of ours. Okay, thank you. Page 3-7 of the FBIS. Thank you. I apologize for the numerous excerpts of record. Multiple. Yeah. My time's almost up, and I just wanted to bring that to your attention and also to say thank you very much for putting this on expedited oral argument. We really appreciate that. Thank you. Thank you.
judges: D Nelson, Kozinski, McKeown